OPINION OF THE COURT
Read, J.
This appeal calls upon us to decide whether the Superintendent of Insurance may exercise his premium rate review and approval authority to disapprove or modify rate increases or decreases deemed approved under file and use provisions. For the reasons that follow, we conclude that he may not.
I.
In 1995, the Legislature enacted Insurance Law §§ 4321 and 4322 (L 1995, ch 504, § 12), which were intended to make affordable health care coverage available to individuals who buy their own health insurance. These provisions mandate all Insurance Law article 43 not-for-profit health insurers and health management organizations (HMOs) certified under Public Health Law article 44 (for purposes of this decision, referred to collectively as “insurers”) to offer, on an open enrollment,[1] community-rated basis,[2] individual direct-payment HMO contracts and point-of-service (POS) contracts providing comprehensive and standardized benefits.[3]
At the time sections 4321 and 4322 were enacted, Insurance Law § 4308 required the Superintendent to approve all insur *169 anee contracts as well as initial premium rates and subsequent rate modifications before they became effective. As is relevant on this appeal, subsection (b) authorized the Superintendent to disapprove proposed initial premiums upon finding that they were “excessive, inadequate or unfairly discriminatory” (see Insurance Law § 4308 [b]). After approval, premiums could only be modified after public hearings and the Superintendent’s prior written approval, a lengthy and often costly process prescribed by subsection (c) (see Insurance Law § 4308 [c] [l]-[3]).
As part of the 1995 amendments, however, the Legislature enacted new subsections (g) through (j), dubbed the file and use provisions. Under the file and use methodology, insurers seeking to increase or decrease premiums may submit a rate filing or application to the Superintendent, which “shall be deemed approved, provided that . . . the anticipated incurred loss ratio for [the] contract form [falls within prescribed minimum and maximum loss ratios (between 80% and 105% for individual direct-payment contracts) as certified by an actuary]” (Insurance Law § 4308 [g] [1]; [j] [emphasis added]).
A loss ratio is determined by dividing claims incurred by premiums earned. The “anticipated incurred loss ratio” is an actuarial prediction of the loss ratio for the upcoming calendar year. Insurers annually report their actual loss ratio for the previous calendar year (see Insurance Law § 4308 [h] [1]). If the actual loss ratio is below 80% the insurer must issue a refund to its subscribers or credit a dividend against future premiums by September 30th of the year following the year in which the loss ratio requirements were not satisfied (see Insurance Law § 4308 [h] [2]). Conversely, if the actual loss ratio exceeds 105% the insurer must increase its premium rates accordingly (see id. § 4308 [h] [3]).
Because the file and use provisions require insurers to give each subscriber at least 30 days written , notice of a premium rate increase (see Insurance Law § 4308 [g] [2]), insurers typically submit rate filings to the Superintendent and notify their subscribers simultaneously at year-end. A cap limiting premium increases or decreases to 10% per year was in force from 1996 through 1999 (id.).
By letter dated November 13, 2001, the Superintendent informed Excellus, which provides health care coverage in 45 upstate counties, that he was modifying his review procedures for certain file and use rate applications “to provide [him] with *170 sufficient time to make the necessary determination that the requested premium rates [were] in compliance with the requirements of Section 4308.” The Superintendent also advised Excellus that premium rate adjustments for individual direct-pay HMO and POS contracts could “not be implemented until the [Superintendent’s] review [was] completed and the company [was] so advised in writing”; however, Excellus “should continue to provide the required 30 day written notice to [its] subscribers based upon the requested effective date.”
In late November 2001, Excellus submitted its rate filing for new premium rates effective January 1, 2002, accompanied by the required actuarial certifications. On November 30, 2001, the Superintendent acknowledged receipt of Excellus’s submission; stated that the requested rates were being reviewed for compliance with section 4308; asked for further information; and cautioned that “the requested premium adjustments . . . may not be implemented until the [Superintendent’s] review is completed and [Excellus] receives a written confirmation that the requested rates have been placed on file.”
By letter dated January 10, 2002, the Superintendent notified Excellus that he had reviewed the rates and was modifying some of them by reducing increases and, in two instances, denying any increase at all. Excellus thereafter commenced this CPLR article 78 proceeding to challenge the Superintendent’s actions.
Excellus argued that the Superintendent’s actions ran afoul of the file and use statutory scheme by improperly conditioning a premium rate change on his review and approval. The Superintendent took the position that he acted properly because section 4308 (b) authorizes him to disapprove any premium that is “excessive, inadequate or unfairly discriminatory.” He asserted that he properly reviewed Excellus’s filed rates under subsection (b), given the “steep” increases and wide discrepancies in premium rates, the sharp decline in direct-pay subscribers and the largely competition-free insurance market involved. The Superintendent also argued that his review was necessary because many rate filings were based on extremely small populations, not reflecting a true basis for community rating. Since insurers use certain market stabilization mechanisms, which may provide them with additional funds to offset losses, the Superintendent further contended that he needed to verify whether the actuaries properly accounted for recoveries from these programs in their rate analysis.
*171 Supreme Court annulled the Superintendent’s letters and determined that Excellus’s filed rates were approved as a matter of law, effective on January 1, 2002. The Appellate Division unanimously affirmed, relying on a plain language analysis (303 AD2d 864 [3d Dept 2003]). The Court observed that “[h]ad the Legislature wished to require [the Superintendent’s] subsequent approval of a rate filing or application, it could have done so through appropriate wording” and concluded that “[the Superintendent’s] interpretation, however laudable its purpose, imports a policy not expressed in the plain words of the statute” (id. at 868). We granted the Superintendent leave to appeal.
II.
When interpreting a statute, we turn first to the statutory text as the best evidence of the Legislature’s intent. “As a general rule, unambiguous language of a statute is alone determinative” (Riley v County of Broome, 95 NY2d 455, 463 [2000] [citation omitted]). Further, although an agency’s rational construction of a statute is normally entitled to deference, “a determination by the agency that runs counter to the clear wording of a statutory provision is given little weight” (Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 103 [1997] [internal quotation marks and citations omitted]).
Here, the “clear wording” of section 4308 (g) (1) unambiguously states that a rate filing or application submitted to the Superintendent “shall be deemed approved,” provided that it is accompanied by an actuarial document certifying that the anticipated loss ratios fall within the statutorily prescribed range. Thus, once the Superintendent receives a new premium rate filing, accompanied by the requisite actuarial certification, the rates specified in the filing are approved by operation of law.
The Superintendent and the dissent would read the statute to mandate approval of file and use rates under the requirements of subsection (g) unless (and, in the case of the dissent, until) the Superintendent subsequently disapproves these rates as “excessive, inadequate or unfairly discriminatory,” which is the standard under subsection (b). We decline to interpolate into subsection (g) an exception unexpressed by the Legislature. This reading of the statute would create a “forced [and] unnatural interpretation[ ]” of “shall be deemed approved” by making approval by operation of law, in fact, contingent upon the Superintendent’s assent (see Castro v United Container Mach. *172 Group, 96 NY2d 398, 401 [2001]; see also McKinney’s Cons Laws of NY, Book 1, Statutes § 94 [legislative intent must be ascertained “according to its natural and most obvious sense, without resorting to an artificial or forced construction”]).
Our interpretation comports not only with the statute’s plain language, but also with its legislative history and overall purpose. In enacting the file and use provisions, the Legislature sought to “reform[ ] the costly and time-consuming system for the approval of [ ] premium rates . . . , allow appropriate rate increases to be implemented on a more timely basis and also help assure that rates are equitable” (Governor’s Approval Mem No. 72, Bill Jacket, L 1995, ch 504, at 6 [emphasis added]). To implement timely rate increases that are fair to consumers, the Legislature established anticipated loss ratios as the gauge of reasonableness, and provided for automatic refunds or credits if actual loss ratios were less.
A letter from former Superintendent Muhl to the Governor’s Counsel—noting that the Insurance Department participated in the drafting of the bill and recommending its approval—emphasizes that the file and use methodology not only “ensures that appropriate rate increases or decreases will be implemented on a timely basis . . . and enables HMOs and insurers to recognize savings in administrative costs” but also “assures that rates are equitable” and “is beneficial to [both] consumers and carriers” (Letter of Superintendent Muhl to Honorable Michael C. Finnegan, Counsel to the Governor, dated July 19, 1995, Bill Jacket, L 1995, ch 504, at 15 [emphasis added]). Indeed, the Department’s regulations state that using a preapproved loss ratio is a proper method to determine the propriety of rates:
“One method of determining whether benefits are reasonable, in relation to the premium charged, is to determine the percentage of the premium collected which is expected to be returned to all policyholders in the form of benefits. This percentage of return is known as the expected loss ratio. In order to prevent the insurer from retaining an unreasonable percentage of the premiums collected for expenses, commissions and profit, minimum expected loss *173 ratio standards have been established” (11 NYCRR 52.1 [f] [emphasis added]).[4]
In short, the legislative history of the file and use provisions is consonant with the statutory language. Neither intimates that the Legislature expected the Superintendent to exercise his traditional rate review powers with respect to premium rates “deemed approved.” The Superintendent protests that the file and use statutory scheme, unmoderated by his review and potential intervention, undercuts affordable health care for direct-pay customers. Even if this is so, we must hew to the statute’s text. The remedy sought by the Superintendent on grounds of public policy lies with the Legislature, not with the courts.[5]
Finally, we note that the Superintendent may always act to ensure that initial contract terms and premiums are not “excessive, inadequate or unfairly discriminatory” under subsections (a) and (b) of section 4308, as previously discussed. He may review rates pursuant to the “excessive management salary” provision of subsection (b)[6] or the audit provisions of subsections (d) through (f).[7] The Superintendent may ensure that the file and use actuarial certifications are correct, and he may is *174 sue regulations regarding how loss ratio certifications are to be prepared.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

. Under open enrollment, the insurer must provide health insurance coverage to all willing purchasers.

. A community rate is determined by the insurer’s average cost per person in the relevant geographic area. Insurers consequently charge subscribers uniform rates regardless of individual health risks or medical history.

. Insurers are thus required to offer two forms of direct-payment contract: the usual HMO contract to cover statutorily specified services from hospitals and physicians approved by the HMO; or a point-of-service contract, where, in addition, the same benefits are available from the hospital or physician of the enrollee’s choosing, typically covered at a percent of the fee.

. The Department’s regulations establish specified loss ratios for different insurance products to ensure that rates are equitable. In many instances, those loss ratios are lower than the 80% allowed by the Legislature in the file and use context (see e.g. 11 NYCRR 52.15 [allowing loss ratios as low as 60% for specified disease coverage]).

. Notably, in recent years the Legislature has created or expanded several health care programs aimed at solving the complicated problem of New York’s uninsureds (see L 1996, ch 639 [New York Health Care Reform Act of 1996]; L 1999, ch 1 [New York Health Care Reform Act of 2000]).

. Section 4308 (b) provides, in relevant part, that “[notwithstanding any other provision of law, the superintendent, as part of the rate increase approval process, may defer, reduce or reject a rate increase if, in the judgment of the superintendent, the salary increases for senior level management executives . . . are excessive or unwarranted given the financial condition or overall performance of such corporation.”

. Section 4308 (e) provides that “ [n]otwithstanding any other provision of law, the superintendent shall have the power to require independent management and financial audits of corporations subject to the provisions of this article whenever in the judgment of the superintendent, losses sustained by a corporation jeopardize its ability to provide meaningful coverage at affordable rates or when such audit would be necessary to protect the interests of subscribers.” Section 4308 (f) provides that “[t]he superintendent shall have the authority to direct the corporation in writing to implement any recommendations resulting from the audit that the superintendent finds to be necessary and reasonable . . . Upon any application for a rate adjustment. . . , the superintendent shall review the corporation’s compliance with the direc *174 tions and recommendations made previously by the superintendent, as a result of the most recently completed management or financial audit and shall include such findings in any written decision concerning such application.”